UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**************************************
Richard LaRiviere, *Pro Se*,               *
          Plaintiff,                              *
v.                                                     *     **No. 1:14-cv-00405-JD**
Officer Adam Rosario, Nurse Lynda Wheeler &   *
Matthew Masewic, M.D.,                       *
          Defendants.                            *
**************************************

## OFFICER ADAM ROSARIO'S LEGAL MEMORANDUM
## IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

NOW COMES Officer Adam Rosario, by and through his counsel, Curtin, Murphy &

O'Reilly, PC, and files this legal memorandum in support of his motion for summary judgment:

## Concise Statement of Material Facts

The plaintiff, Richard LaRiviere, who appears *pro se*, contends, *inter alia*, that

Hillsborough County Department of Corrections Officer Adam Rosario, despite being tasked

with checking on him every fifteen [15] minutes, nevertheless ignored him and thereby allowed

LaRiviere to severely cut himself and then bleed for ninety [90] minutes before summoning help.

However, the plaintiff (who admittedly suffers mental illness) relies on erroneous predicate facts

that can be shown to be false by verified testimony and records, warranting summary judgment

for Officer Rosario – a disposition granted by this court in earlier, like situations.

## Procedural History

The court (Johnstone, Judge-Mag.) conducted the requisite review of this *pro se*

[prisoner] complaint and noted that, with respect to Officer Adam Rosario, LaRiviere made the

following factual averments:

> At the time of his suicide attempt, LaRiviere was in a cell that HCDC Corrections
> Officer ("C.O.") Rosario was required to check every fifteen minutes. LaRiviere

alleges he "bled out" for ninety minutes, losing two liters of blood, either because Rosario failed to check on LaRiviere as he was supposed to, or because he did check on LaRiviere but ignored his condition.

See Court Doc. No. 7 at p. 2.  Assessing such allegations under an "endangerment" theorem

(identified by the court as Claim # 3)[1], her honor wrote:

> The constitution requires prison officials to take "reasonable measures to guarantee the safety of the inmates." Farmer v. Brennan, 511 U.S. 825, 832-33 (1994). To establish unconstitutional endangerment, an inmate must assert facts to demonstrate that, objectively, he was incarcerated "under conditions posing a substantial risk of serious harm," and that the involved prison officials knew of and disregarded the excessive risk to the inmate's safety. Id. at 834. LaRiviere has asserted sufficient facts to allow Claim 3, identified above, to proceed against Rosario, and in an order issued this date, the court directs service of the complaint on Rosario.

Id. at p. 5-6.

ARGUMENT

I.   **LARIVIERE'S PREDICATE FACTS NECESSARY TO SUPPORT HIS ENDANGERMENT THEOREM ARE LEGALLY INSUFFICIENT TO PERMIT CONTINUED PROSECUTION OF THE PERMITTED CLAIM AGAINST OFFICER ADAM ROSARIO**

Preliminary review of the theorem asserted against Officer Rosario aptly noted that "[t]o

establish unconstitutional endangerment, an inmate must assert facts to demonstrate that,

objectively, he was incarcerated 'under conditions posing a substantial risk of serious harm,' and

that the involved prison officials knew of and disregarded the excessive risk to the inmate's

safety. Court Doc. No. 7 at p. 6-7 (quoting Farmer v. Brennan, 511 U.S. 825, 834 (1994)).  This

---

[1]The preliminary review "summarized" this "claim[] asserted in the complaint" as follows: "3. C.O. Rosario violated LaRiviere's Fourteenth Amendment right to humane conditions of pretrial confinement, in that, with deliberate indifference to a substantial risk of serious harm, Rosario allowed LaRiviere to 'bleed out' for ninety minutes after LaRiviere's suicide attempt."  See Court Doc. No. 7 a tp. 4.

2

court has noted:

> The "deliberate indifference" standard has two components. First, the deprivation alleged by the prisoner "must be, objectively, sufficiently serious." <u>Farmer</u>, 511 U.S. at 834 (internal quotation omitted). Second, the prison official must have a culpable state of mind; he must subjectively be aware of a substantial risk of serious harm, and he must fail to take reasonable measures to avert the potential harm. <u>Burrell</u>, 307 F.3d at 8; <u>see also Farmer</u>, 511 U.S. at 834-35.

<u>Johnson v. Poulin et al.</u>, No. CV-07-161-PB, Opinion No. 2008 DNH 086 at p. 19-20 (4/24/08).

Applying these principles, Judge Barbadoro found that the record led to the conclusion that the plaintiff could present no evidence to show that the defendant corrections officer "was subjectively aware that his statement would create a substantial risk of serious harm to Johnson." <u>Id.</u> at p. 20-21.  <u>See also Ham v. Anderson</u>, No. 14-CV-135-SM, Opinion No. 2014 DNH 105 at p. 4 (5/8/14) (dismissing prisoner's endangerment theorem asserted against prison staff where there were insufficient factual issues to suggest that "any defendant acted with deliberate indifference in disregarding a known risk to [the inmate's] safety[.]").  Against this legal standard, the existing record, in conjunction with the appended evidence, warrants summary judgment for Adam Rosario because the evidentiary record is insufficient to proceed.   The submitted affidavits, records and admissions all amply support this requested *brevis* disposition.

Devonta Searcy Affidavit: The appended affidavit of the plaintiff's cell-mate corroborates the verified facts that support Officer Rosario's request for *brevis* disposition.  Devonta Searcy's affidavit establishes the following:

> 1.     On June 17, 2014, [he] was housed in the Hillsborough County House of Corrections, on unit 2D, in cell number 2255. [His] cell mate was Richard "Rich" LaRiviere.
> 2.     Ordinarily, Rich was upbeat, doing things such as singing. Looking back on it, this night he was not upbeat; however, he never said to [Searcy] that he was suicidal, would try to cut himself or anything like that.  Though [they] were in the

same cell, [he] never saw [LaRiviere] cut himself.

3.      [He] recall[s] that on that night, an officer conducting rounds shined a flashlight on [his] face while [he] was sleeping (the cell was dim and dark,  this happened late evening).  This caused [him] to wake up and when [he] did, [he] heard Rich softly moaning and [Rich] said "help" in a soft voice. [Searcy] looked down ([he] was on the upper bunk) and saw some blood on the floor under Rich's lower bunk.

4.      [He] went to the door of the cell and called for an officer; the officer on duty ([he doesn't] recall who it was) came to the door and when [Searcy] said that there was blood on the floor, he [the officer] shined his light inside and called a code on his radio. Other officers and a nurse came to [their] cell.

5.      [Searcy] was removed from [their] cell and placed in another cell while they responded to Rich.

6.      [He] had no knowledge until that time that Rich had cut himself and [they] were in the same cell, in bunk-beds, during that same night.

7.      [He] never heard Rich tell any officers or nurses or show them that he had cut himself before the time that [he] saw blood on the floor and called for an officer.

8.      At that time, Rich later told [Searcy] that he did not receive a Father's Day card from his daughter, nor any contact from his daughter or mother.

9.      [He] remember[s] an officer telling [him] that [he] was lucky [he] noticed and called for help because [he] could have been blamed for it ([He didn't] know why [the officer] said this).

10.     Another inmate who was housed in the cell above [Searcy's] (named Brown) later said that he heard a thud (when Rich fell off the toilet, as later told to [Searcy]) a short time before this all happened, but [he/Searcy] did not hear this and apparently slept through Rich using the toilet and falling down when doing so.

See Devonta Searcy Affidavit, *passim* (Attachment #2).

Adam Rosario's Affidavit: The appended affidavit of Officer Rosario establishes he has been employed as a corrections officer for three years, having graduated from the county's corrections academy and having served a probationary term under a senior [field training] corrections officer; in his role as a corrections officer, he regularly works the overnight shift.  See Adam Rosario Affidavit (Attachment #3) at ¶ 1.  Rosario notes that Mr. LaRiviere's HCDOC inmate/institutional file includes all pertinent records (including incident reports) pertaining to

4

the plaintiff, including the former's incident report prepared on June 17, 2014.  Id. at ¶ 2.  The

records show that LaRiviere entered the jail on May 21, 2014 and at that time "answered

affirmatively when asked about 'visions,' 'hearing voices,' having 'needle marks,' and having

had prior psychiatric care."  Id. at ¶ 3.  Classification screening revealed that he had a prior gang

affiliation, prior incarcerations in multiple state, earlier convictions and "mental health

problems."  Id. ¶ 4.  Officer Rosario further avers, in pertinent parts:

> Multiple reports and records show that on June 17, 2014, at approximately 01:35
> hours (military time), a "10-33" medical emergency was called on housing unit
> 2-D by me, Officer Adam Rosario.  Another inmate [Mr. LaRiviere's cell-mate],
> housed in the same cell as Mr. Lariviere, summoned me to Lariviere's cell door
> [#2255, which was unlit for the evening, to allow occupants to sleep]- on that date
> and time -- and when I arrived at the door, I observed Lariviere laying in the
> bottom bunk, unresponsive, with a blanket over his body and blood evident on the
> cell floor.  Prior to this, I had seen no blood, nor any sign of injury or irregularity
> with respect to this inmate.

> Multiple records and reports show that a sergeant and two other officers
> responded (n.b., officers, for safety reasons, we are not permitted to enter a cell
> alone) to unit 2-D and the staff likewise observed blood on the floor and on the
> plaintiff's sheets and socks.  Lariviere initially did not respond to the officers and
> had a self-inflicted laceration approximately 2-3 inches in length on his left inner
> calf.  Officers applied direct pressure and searched the cell for a razor.  Nurse
> Martin arrived and assessed Lariviere, who at first did not respond to commands,
> but within a minute, became coherent, and stated that the razor was located
> underneath his mattress.  Due to the laceration and low blood pressure, Lariviere
> was transported [by EMS] to the Elliot Hospital Emergency Room, at 02:05.

Id. at ¶¶ 5 & 6.  Officer Rosario, immediately after the incident with LaRiviere, prepared an

incident report (Attachment #4) and this report indicates that he "had been conducting a round,

checking on inmates on housing unit 2-D [records show that at that time, there were 75 inmates

housed on this unit], when [he] was summoned by Lariviere's cell-mate, who stated: 'Hey C.O.,

come here.'" Id. at ¶ 7.  He went on to relate that "When I approached the cell and inquired what

he needed, the cell-mate answered: 'Look, my cell mate is f-king bleeding.'" Id.  When he

"observed Lariviere, [he] saw him on the bottom bunk, under sheets and a blanket, with a small

amount of blood on the floor, next to the bunk."  Id.  He "shouted Lariviere's name but received

no reply."  Id.  Accordingly, he "immediately called a '10-33' [signifying a medical emergency]

over [his] radio and maintained visual contact with Lariviere and asked the cell mate to remain

by the cell door." Id. "A supervisor, three fellow offices and a staff nurse [Martin] responded to

the unit." Id.  Rosario affirms: "The supervising sergeant, after being briefed by me, instructed

me to return to the control panel (where entry and exit and door operation is controlled) where I

initiated opening of Lariviere's cell (#2255)[,]" and added: "The response team (including the

sergeant, responses officers and nurse) then entered the cell and attended to Lariviere," removing

him [with the assistance of EMTs] out of the jail and to the hospital ER.  Id.   Additionally,

Officer Rosario notes admissions made by LaRiviere[2] (while hospitalized) and the plaintiff's

assignment to a "special (psychological) watch" [on a special needs housing unit adjacent to the

medical department and clad in a "safety smock" garment] on his return to the jail on June 19th.

Id. at ¶¶ 8 & 9.  These affirmations evidence that Officer Rosario had no active knowledge of the

---

[2]Officer Menec's appended report (Attachment #5) notes that, while assigned to hospital
duty, he "asked Lariviere why he had 'cut' himself.   Lariviere answered, 'I couldn't take it
anymore. I thought I would of just left in a black bag.  My daughter didn't even bother with me
on Father's Day.'  The officer then asked him about the manner in which he cut himself and
Lariviere responded: 'I had it all planned out. I broke my razor and waited till my cell mate was
asleep. About 5 minutes before lights out, I cut my leg. I then had it wrapped with towels and
sheets so the C/O couldn't see the blood. Then I went to sleep.'  He added: 'It would have worked
but an hour to an hour and half after I did I had to go to the bathroom. While I was using the
bathroom, I got blood on the floor and I blacked out and hit my face (fell down).' [Officer
Menec] then asked how he returned to his bunk if he had blacked out, to which Lariviere stated:
'After I hit my head I came to and crawled back into bed and covered up. The problem is I got
blood on the floor and I don't know if was the C/O or my cell mate that found it.'" Id.

plaintiff's self-inflicted wound (despite shining his flashlight into the darkened cell 2255, while conducting a round) on the night in question [something also unknown to LaRiviere's cell-mate, who was on the bunk just above] until summoned by Devonta Searcy – a sharp contrast from the predicate facts relied on by this court in permitting this "endangerment" claim to proceed. Moreover, the plaintiff's "admissions" further undermine the continued prosecution of this claim.

Jason Riley Affidavit: The appended affidavit of Jason Riley further underscores the propriety of judgment in favor of Adam Rosario.  On the evening in question in this case, HCDOC Lieutenant Jason Riley served as the "shift commander, being the most senior official in the jail and responsible for the entirety of the jail during overnight hours[,]" in which role he had responsibility for all staff" and security operations.  See Jason Riley Affidavit (Attachment #6) at ¶ 1.  Lieutenant Riley avers that on the night in question, "a '10-33' (medical emergency) was called (over the radio) by Officer Adam Rosario, at 01:35, after he observed Lariviere in his cell, unresponsive, covered by a blanket and with blood on the cell floor near him." Id. at ¶ 2.  The lieutenant further notes that staff assignment records (and jail documentation) evidence that Officer Rosario was not the officer assigned to LaRiviere's housing unit during this overnight shift; rather, he was assigned to serve as a "response" officer on the second floor – covering respective housing units only when the responsible officer was on "break" [ordinarily only thirty [30] minutes in duration].  Id. at ¶ 3.  Addressing the temporal aspects of this case, he writes:

> Housing area log sheets ("pod logs") constitute a contemporaneous diary of activities on each housing unit, recorded by officers who are serving in each pod. I have accessed the housing logs for each housing unit for the dates of July 16th and into July 17th.  With respect to housing unit 2-D, the record shows that Officer O'Keefe came on duty at 23:05 and relieved Officer Abbott (who was completing second shift, which lasts from 15:00 to 23:00).  These two officers accounted for property, reviewed seizure and other advisements, conducted a head

count and conducted a round, after which Officer Abbott departed (at 23:15). At 23:25, Officer O'Keefe issued a warning that "lights out" would follow in five minutes. At 23:42, Sergeant Fournier arrived on the unit, inspected and confirmed that all cell doors were closed and secure. Officer O'Keefe then conducted a "round" (looking into each cell) at 23:45; he followed this by searching and confirming the security of the "rec yard," with "no issues" noted, at 23:50. At 23:55, this same officer reviewed and organized inmate name tags and then conducted another "round" at 00:00. Due to all inmates being locked down during overnight hours, officers may depart the unit for brief periods and records confirm he left 2-D at 00:01, returning at 00:17 and conducting a round at that time (during these brief departures, records of housing unit 2-C show that Officer O'Keefe was conducting rounds on this adjacent pod, as well). At 00:25, Officer O'Keefe inspected the books/bookshelf area and completed another round at 00:30. This same officer left the unit at 00:32, returning and conducting a round at 00:42; at 00:55, he collected and inspected the mail and performed another round at 01:00. Officer O'Keefe left the unit at 01:14. Officer O'Keefe's last entry, before leaving for break, appears at 01:01, where he notes his coming departure from the unit. Accordingly, records show that Officer Rosario was not on housing unit 2-D for the first two and one-quarter hours of the shift, arriving only at 01:14 to allow the 2-D housing officer (O'Keefe) to go on break.

Id. at ¶ 4. Noting that Officer Rosario only entered LaRiviere's "pod" at 01:14, conducting a round with the housing officer [O'Keefe] and that on his second pass, at 01:30, he initiated a "10-33" medical emergency call. Id. at ¶ 5. At that point, eight [8] officers, HCDOC medical staff [nursing] and Manchester FD EMT personnel responded and attended to LaRiviere, while Rosario manned the control panel and monitored the other inmates. Id. He asserts: Accordingly, the log shows and evidences that Officer Rosario was not on Lariviere's housing log for the first two and a quarter hours of his shift that evening[,] only arriving 15 minutes before discovering that LaRiviere was cut [during his first solo "round"]. Id. The lieutenant also describes in detail other staff involved, the emergency measures and the investigation undertaken. Id. at ¶ 6. Significantly, he confirms that "Mr. Lariviere was not on any watch when this cutting incident occurred (i.e., watches of inmates ordered by medical/mental health staff, where there is history, evidence or other risk of self harm) and that there were no medical restrictions for him." Id.

This testimony confirms that Officer Rosario was not on LaRiviere's housing unit for ninety [90] minutes after the plaintiff allegedly cut himself, engaged in one pass (with the assigned housing officer) on entry and discovered the plaintiff's concealed self-injury only fifteen [15] minutes after arrival (despite the claimant being in a darkened cell and covered in bedding). The requests for admissions likewise establish the record and further buttress summary judgment. .

    Requests for Admissions: On March 27, 2015, the undersigned issued requests for admissions to the plaintiff, citing FRCP 36; however, such requests resulted in no response from LaRiviere and these "admissions" were thereafter filed with this court (see Court Doc. No. 37; 6/28/15), rendering such facts/statements acknowledged for this summary judgment record: 1. That "[o]n June 17, 2014, Richard LaRiviere was housed in cell 2255 on housing unit 2-D of the Hillsborough County House of Corrections ["HCHOC"];" 2. That on that date and at that time, "Richard LaRiviere had a cell-mate in his cell at the HCHOC;" 3. That on that date and at that time, the plaintiff "self-inflicted a laceration to his lower leg;" 4. That the plaintiff "returned to his bunk after inflicting this laceration;" 5. That he "concealed his laceration by covering his body and laceration with a towel, sheet and/or blanket (one, a combination or all three);" 6. That he "carried out his self-inflicted wound and return to his bunk following 'lights out' on housing unit 2-D (issued on or about June 16-17, 2014); 7. That he, "after inflicting and concealing his laceration, failed to alert his cell-mate, other inmates, correctional staff or other individual of his self-inflicted laceration;" 8. That "approximately ninety [90] minutes passed between the time that Richard LaRiviere self inflicted a laceration on his leg and he arose to use the toilet at approximately 1:35 A.M;" 9. That "when rising to and attempting to use the toilet, at approximately 1:35 A.M., Richard LaRiviere fell, struck his face and thereafter crawled back to

his bunk, leaving blood on the floor of cell 2255;" 10.  That "at approximately 5:00 A.M.,

Richard LaRiviere, while at the Eliot Hospital, admitted to [Corrections Officer] CO Menec that

he had cut himself, attempted to conceal it under bedding, fell when trying to use the toilet and

crawled back into his bunk, before being found by either his cell-mate or a corrections officer;"

11.  That "[o]n June 17, 2014, at approximately 5:00 A.M., Richard LaRiviere, while at the Eliot

Hospital, admitted to CO Menec that he used a razor to cut himself and admitted he had waited

until his cell-mate was asleep and inflicted the laceration to his leg within five [5] minutes of "

'lights out' on the housing unit;" 12.  That the plaintiff, while at the Eliot Hospital also "admitted

to CO Menec that he fell when attempting to use the toilet, blacked out, fell and struck his head,

but managed to crawl back to back and cover his laceration again with bedding;" 13.  That he

further admitted to CO Menec (on that occasion) that "he fell when attempting to use the toilet,

blacked out, fell and struck his head, but managed to crawl back to back and cover his laceration

again with bedding;" 14.  That he further stated to CO Menec that "he self-inflicted a laceration

to his leg because his daughter had not even bothered with him on Father's Day;" and 15.  That

he further told CO Menec that "he intended to leave the jail in a 'black bag,' and that he 'couldn't

take it anymore,' causing him to self-inflict the laceration to his lower leg that prior evening."  Id.

These admissions constitute established facts in adjudicating this dispositive motion.

Conclusion:  In the final analysis, the plaintiff's endangerment is unsustainable, as a

matter of law.  Affidavit testimony and the plaintiff's own admissions amply illustrate that rather

than this officer knowing of and consciously disregarding the risk posed by a self-inflicted

wound, LaRiviere made determined and surreptitious efforts to conceal the laceration, inflicting

it at "lights out," at a time when he was not on a mental health "watch," in his cell [even

unbeknownst to his cell mate, who was sleeping just above him], and was only discovered by his cell mate, when the plaintiff got up to use the toilet, fell and "blacked out," before returning to his bunk.  Officer Rosario spent the first two and a quarter hours of his overnight shift attending to other matters and did not oversee plaintiff's housing unit; he "covered" for other staff [who were taking breaks] fifteen minutes before discovering LaRiviere's self inflicted wound, during his first solo "round" during this half-hour [½] of coverage, immediately summoning assistance. This established record stands in sharp contrast to the basis on which this particular theorem was originally allowed and when applied, in light of prior decisions rendered by this court, *supra*, militates against continued prosecution of it.

## II.   LARIVIERE FAILED TO FILE A GRIEVANCE CONCERNING ENDANGERMENT AND/OR OFFICER ROSARIO, IN CONTRAVENTION OF THE PRISONER LITIGATION REFORM ACT

This court (McCafferty, J.) has written:

According to the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Claims for which administrative remedies have not been exhausted are subject to dismissal. See Medina-Claudio v. Rodríguez-Mateo, 292 F.3d 31, 36 (1st Cir. 2002).
"[F]ailure to exhaust is an affirmative defense under the PLRA." Jones v. Bock, 549 U.S. 199, 216 (2007). As such, it "must be raised and proved by the defense." Cruz Berríos v. González-Rosario, 630 F.3d 7, 11 (1st Cir. 2010) (citing Jones, 549 U.S. at 216). Finally, "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002) (citing Wilson v. Seiter, 501 U.S. 294, 299 n.1 (1991)).

Crosby v. Strafford County Dept. of Corrections, et al., Civil No. 12-cv-383-LM, Opinion No.

2014 DNH 182 at *7-8 (D.N.H. 9/3/14).  In another case previously before this court, summary

judgment was granted to corrections officers who were not subject to a grievance via this jail's

administrative processes; the court's (McAuliffe) analysis noted:

> It is beyond dispute that [the plaintiff] was well-versed in the administrative
> grievance process and availed himself of that process quite frequently. It is also
> plain that when he wished to file an administrative grievance, he was able to
> obtain the necessary forms to do so. Why he chose not to grieve the events related
> to the [particular] incident is entirely unclear. But, he certainly could have done so
> if he wished. And, perhaps more importantly, defendants have established that he
> was not thwarted in his efforts to obtain the requisite forms, nor did they
> otherwise prevent him from exhausting available administrative remedies related
> to that incident.

Kargbo v. Brown, et al., Case No. 11-cv-130-SM, Opinion No. 2013 DNH 170 at *7 (D.N.H.

12/13/13).   In the instant case, the record establishes that the HCDOC maintains a mandatory

grievance process for internal complaints, that LaRiviere used it relative to another [medical

treatment] issue and that its application here is fatal to continued prosecution of the plaintiff's

endangerment theorem.

The appended affidavit of Officer Rosario includes the following paragraph relevant to

PLRA application and analysis:

> 10.    Mr. Lariviere's inmate file has only one grievance.  On 6/9/14, he filed
> grievance numbered 14-00125, which states under "brief description of
> grievance:" "I have health issues that I need to speak to a doctor about: [1] itching
> and rash due to chronic Hep-C; [2] lower back pain from previous injury. Nurse
> Wheeler has a grudge against me because according to her, "I worked the system."
> Also, I was given a physical and informed the nurse that I had been siezure [sic]
> free for over 6 months. She stated that I would have no restrictions. This was
> overruled by someone. I would like to see the doctor so he can be the judge of
> what I should and shouldn't be treated for, not a nurse who has a grudge because
> she knows my uncle Ugene LaRiviere, M.D.  I just ant what every other inmate is
> entitle [sic] to."  On 6/10/14, this grievance was received a captain and because it
> concerned medical issues, forwarded it to Health Services Administrator, Nurse
> Denise Ryan.

> 11.    On 6/12/14, Nurse Ryan wrote, in reply to this grievance, "you were
> placed on restrictions on 5/21/14 by Nurse Martin due to your detox watch and

your history of seizure disorder which you stated you had upon your arrival here. Records were also obtained from Ohio DOC/State Prison which indicate a history of seizure disorder. You are also on the list for bloodwork due to your complaints of itchiness and history of Hep-C. The doctor will review those labs and f/u accordingly."  This grievance and response were then provided to the superintendent of the jail and issued back to Mr. LaRiviere.

12.     As can be noted on these records, we print and monitor control numbers on all grievance forms provided to the staff for distribution, in order that each can be accounted for and tracked.  All grievances are initiated by submission of a request form and such forms must be provided to the floor sergeant/supervisor; this supervisor provides the inmate with the number-controlled grievance form (and follows up with the inmate if it is not returned) and receives such back (to avoid any claims that officers preclude inmates from submitting grievances); only supervisors [Sergeants or Lieutenants] investigate the issues set forth in grievances (but are not permitted to conduct investigations from grievances that involve them directly) and such results are forwarded to the Captain and ultimately to the Superintendent, per chain of command.

13.     Per the inmate handbook [each inmate receives a handbook on intake and its returned, when such inmate is released is documented in each individual's institutional file], our grievance system is a mandatory requirement and an inmate is directed to use a request slip to obtain a grievance form.  In addition to the procedure for submission described above, each inmate filing a grievance receives a written reply, as well as a review (an appeal, though not legally required) by the superintendent or his designee.  A copy is also permanently kept in the inmate's file.

14.     The handbook and policy require that an inmate must explore an informal resolution before grieving an issue related to his confinement.  If unsatisfied, the inmate is required to file a request slip, seeking a grievance form, with a suggested remedy, and that this is filed with a unit officer.  All such request forms must be answered within seven (7) working days of receipt; customarily, inmates receive the requested forms within one day. Step three (3) of our grievance process provides that an inmate must grieve any issues relative to his confinement within 15 days of the event[s] and that the jail responds to these within 15 days.

15.     By failing to file any grievance relative to the claim he asserts against me in this case, the plaintiff did not comply with the HCDOC mandatory grievance procedure and frustrated my own and my counsel's attempts to timely investigate such allegations and fully defend this litigation. The plaintiff's other grievance makes clear that he was able to file grievances and that he understood both the procedure and the necessity to timely submit his grievances.

16.     Via my legal counsel, I am now familiar with the Prisoner Litigation
Reform Act and the mandate that inmates fully exhaust their administrative
remedies before filing a lawsuit, such as this one [Mr. LaRiviere remains in
custody, having filed this during incarceration at another jail, where he is
reportedly pre-trial on federal charges).  I prepare this affidavit to be filed in
conjunction with my counsel's entry of summary judgment on qualified immunity,
the established facts and/or failure to exhaust administrative remedies grounds.

See Adam Rosario Affidavit, *passim* (Attachment #3).  This history reveals not only LaRiviere's

familiarity with the grievance process, but his use of it in the same month as [prior to] the alleged

endangerment.   Because LaRiviere failed to file a grievance pertaining to Officer Adam Rosario

and/or the events of June 17th (and his endangerment claim), the Prisoner Litigation Reform Act

mandates the dismissal of this particular gravamen at this time.

Conclusion: The verified facts establish that the plaintiff self-inflicted a wound to his calf

after lights out were called and that he covered the laceration in an attempt to conceal it from his

cell-mate [who was on the bunk bed immediately above] and corrections staff on the housing

unit. Further, the record establishes that Officer Rosario was not the housing unit assigned to

LaRiviere's pod and that he was present for only fifteen minutes [conducting one round to check

cells of sleeping inmates] before Devonta Searcy called for assistance from cell 2255.  The

admissions buttress these verified facts and when combined with the affidavits and referenced

records, entitle Adam Rosario to judgment as a matter of law on the permitted endangerment

gravamen now before this court.   Finally, even assuming *arguendo* that Mr. LaRiviere could

advance this "endangerment" claim, despite asserting facts that are negated by his own

"admissions," as well as the appended affidavits, he has also failed to comply with the tenets of

the Prisoner Litigation Reform Act, rendering this count subject to statutory dismissal on two,

independent bases.

Respectfully submitted,

Officer Adam Rosario

By his counsel,

Curtin, Murphy & O'Reilly, PC

Date: November 17, 2015          /S/ John A. Curran
                                 John A. Curran    (NH Bar #8150)
                                 20 Trafalgar Square, Suite 201
                                 Nashua, NH 03063
                                 Tel: (603) 888-7188;  jcurran@cmopc.com

Certificate of Service

I hereby certify that a copy of this filing is being mailed, USPS first-class, postage pre-paid, to the plaintiff, Mr. LaRiviere,who appears *pro se*, at the following address (obtained from the Federal Bureau of Prisons): Richard LaRiviere, Register No. 13730-049, FCI SCHUYLKILL, FEDERAL CORRECTIONAL INSTITUTION, P.O. BOX 759, MINERSVILLE, PA  17954 [per mailing instructions obtained from that facility's website], and via ECF to co-defendant's counsel, Attorney Murdough (counsel for co-defendant Matthew Masewic, M.D.), with electronic copies of same to my clients, via the county.

/S/ John A. Curran
John A. Curran    (NH Bar #8150)

15